**U.S. DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

NOV 21 2014

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 14-CR-00073-01-PB |
| | ) | |
| LOIS PATRICIA PATTON, A/K/A "TRIDA" | ) | |
| A/K/A LOIS PATTON-HAYNES | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John P. Kacavas, the United States Attorney for the District of New Hampshire, and the defendant, Lois Patricia Patton, and the defendant's attorney, Jonathan R. Saxe, Esquire, enter into the following Plea Agreement:

1.  **The Plea and The Offense**.

The defendant agrees to plead guilty to Count One of the Superseding Indictment charging her with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §371, and to Counts Thirteen and Fourteen of the Superseding Indictment each charging her with Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.   The defendant further agrees to the sentencing stipulations set forth in Paragraph 6 of this agreement.   In exchange for the defendant's agreement to those stipulations and her guilty plea, the United States also agrees to the sentencing stipulations identified in Paragraph 6 and, upon sentencing, to dismissal of Counts Two through Twelve of the Indictment.

1

RECEIVED
U.S. ATTORNEY'S OFFICE
NEW HAMPSHIRE
2014 NOV 20 AM 8 12

### 2.  **The Statute and Elements of the Offense**.

#### a.  Conspiracy to Commit Wire Fraud

Count One of the Superseding Indictment charges the defendant with Conspiracy to

Commit Wire Fraud in violation of Title 18, United States Code, Section 371.   Section

371 provides, in pertinent part, as follows:

> If two or more persons conspire ... to commit any offense against the United States
> ..., and one or more of such persons do any act to effect the object of the
> conspiracy, each shall be [guilty of a crime].

18 U.S.C. § 371.   In the context of this case, the offense of conspiracy, as defined in

Section 371, has the following elements, each of which the government would be required

at trial to prove beyond a reasonable doubt:

> First, that the agreement specified in the indictment, and not some other agreement
> or agreements, existed between at least two people to commit the crime of Wire
> Fraud.

> Second, that the defendant willfully joined in that agreement; and

> Third, that one of the conspirators committed an overt act in an effort to further the
> purpose of the conspiracy.

First Circuit Pattern Jury Instructions, Criminal Cases, Parts 4.03 (1998 ed.).

The statute that makes Wire Fraud a crime, Title 18, United States Code, Section

1343, provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud,
> or for obtaining money or property by means of false or fraudulent pretenses
> representations or promises, transmits or causes to be transmitted by means of wire,
> ... in interstate commerce ... any writings ... [or] signals ... for the purpose of
> executing such scheme or artifice [shall be guilty of a crime.]

18 U.S.C. § 1343.   In the context of this case, the elements of the offense of Wire Fraud

are:

> First, a scheme or artifice to defraud or for obtaining money or property by false or fraudulent pretenses, substantially as described in the Superseding Indictment;
>
> Second, the defendant's substantial and knowing participation in the scheme or artifice with the intent to defraud; and
>
> Third, the use of interstate wires on or about the dates alleged in the Superseding Indictment charging document in furtherance of the scheme or artifice.

First Circuit Pattern Jury Instructions, Criminal Cases, Part 4, §4.13 (1998 ed.).

   b. Aggravated Identity Theft

Counts Thirteen and Fourteen of the Superseding Indictment each charge the

defendant with Aggravated Identity Theft in violation of Title 18, United States Code,

Section 1028A.   Section 1028A provides, in pertinent part, as follows:

> [w]hoever, during and in relation to any ... violation [of 18 U.S.C. § 1343], knowingly ... possesses or uses, without lawful authority, a means of identification of another person shall [be guilty of a crime].

18 U.S.C. § 1028A.   In the context of this case, the elements of the offense of

Aggravated Identity Theft are:

> First, that the defendant committed the crime of Wire Fraud;
>
> Second, that during and in relation to that crime, the defendant knowingly possessed or used as a means of identification, the name, date of birth and social security number described in the indictment, without lawful authority;
>
> Third, that the name, date of birth or Social Security number belonged to another actual person; and

<u>Fourth,</u> that the defendant knew that the name or social security number belonged to another person.

<u>First Circuit Pattern Jury Instructions (Hornby), Criminal Cases,</u> Part 4.18.1028A (2012

ed.).

### 3. **Offense Conduct**.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove each of the essential elements of the offenses beyond a reasonable doubt by establishing the following facts:

a. <u>April 16 Transactions</u>

On April 16, 2014, agents of the U.S. Secret Service, Boston Field Office, with detectives from the Boston (Massachusetts) Police Department (BPD), Concord (Massachusetts) Police Department (CPD), and Medway (Massachusetts) Police Department (MPD) were conducting surveillance at Patton's residence, which according to motor vehicle records is located at 567B Norfolk Street, Mattapan, Massachusetts.   The purpose of the surveillance was to observe fraudulent activity perpetrated by Patton and/or individuals associated with her.

At approximately 1:25 p.m., the surveillance team observed a black Lincoln Aviator bearing Massachusetts tag "659WM5" arrive and park in front of Patton's residence. According to a check with the registry of motor vehicles, the Aviator was owned by Laura A. Minot, 105 Itasca Street, Mattapan, Massachusetts.   Shortly after the black Lincoln Aviator arrived at Patton's home, an African American female, later identified as Patton, exited the residence and entered the passenger side of the vehicle.

The Aviator then departed Patton's residence and the surveillance team followed it as it travelled north.   At approximately 3:25 p.m., the Aviator arrived at Savers, 224 Daniel Webster Highway, Nashua, New Hampshire.   Upon the vehicle's arrival at Savers, another African American female -- later identified as Minot -- exited the vehicle.   Using a cane, Minot walked down a partially unpaved incline to the Best Buy store next door to Savers at 220 Daniel Webster Highway.   There were many parking spaces available at Best Buy which would have been much more convenient for Best Buy shoppers – particularly for someone needing a cane to walk – than the space at Savers in which the Aviator parked.

Members of the surveillance team followed Minot into Best Buy.  They watched Minot walk to the laptop computer department where she spoke to a sales clerk for a few minutes before leaving the store.  According to both a Best Buy store manager and the sales clerk who served Minot, Minot opened a Best Buy credit card account during her visit.  The manager remarked that he recognized Minot as someone who frequently opened credit card accounts at his particular Best Buy store.

The sales clerk further advised that Minot opened the account in the name "Amy Hunter," of Sudbury, Massachusetts, presenting a Massachusetts driver's license with her application.  The driver's license included a picture of an African American woman bearing a strong resemblance to Minot but purported to have been issued in the name "**Ann R. Hunter**" of Medfield, Massachusetts.  (The store clerk accepted the application even though the name and address on the driver's license did not correspond to the name and address on the application.)

The actual **Ann R.** Hunter was interviewed.  She reported that several retailers have informed her that, on April 12, 2014, credit accounts were opened in her name and then used to make purchases, including an account at Best Buy that had been used to purchase $2000 in gift cards on that date.  She had no prior knowledge of those transactions.  She did not know Patton or Minot nor did she authorize them to open any credit accounts or make any purchases in her name.  The actual **Ann R.** Hunter is a white female, certainly not the African-American woman pictured on the "Ann R. Hunter" license that Minot presented.

The actual Amy Hunter also was interviewed.  She lives at the Sudbury address Minot used on the credit card application.  The telephone number Minot provided on the original credit card application was (978) 460-2963, a number assigned to the actual Amy Hunter.  She had no prior knowledge of the transactions described herein and did not know Patton or Minot.  Like the actual **Ann R.** Hunter, the actual Amy Hunter of Sudbury, is a white female and also clearly is not the individual on the driver's license presented by Minot.

According to the surveillance team, after Minot left Best Buy, she returned to the Saver's parking lot and entered the passenger side of the black Lincoln Aviator, which was still occupied by Patton.  The Aviator then departed and, at approximately 3:38 p.m., arrived at the Pheasant Lane Mall, 310 Daniel Webster Highway, Nashua, N.H.  At that time, the Aviator parked in front of the Dick's Sporting Goods store, through which Minot entered the mall, while Patton once again remained inside the Aviator.  After following Minot into the mall, Minot proceeded to the Best Buy Mobile store.  Minot spent several minutes speaking with a Best Buy Mobile cashier before she left the store and the mall and returned to the Aviator.

The Best Buy Mobile cashier who served Minot that day stated that, during her visit to the store, Minot had attempted to purchase $2,000 in Best Buy gift cards using the newly obtained "Amy Hunter" credit line.  A fraud investigator for Citibank, which issues and

5

administers Best Buy's credit card accounts, confirmed that information. He further stated that the attempted purchase of the gift cards was not successful because Citibank had flagged the transaction for possible fraud.

At approximately 4:12 p.m., the surveillance team followed the black Lincoln Aviator to Staples at 252 Daniel Webster Highway, Nashua, N.H., where Patton got out of the vehicle and entered the store. A member of the surveillance team followed Patton inside and observed her making inquiries to a sales associate about disposable cell phones. Patton left the store without making a purchase and then entered the Aviator, which was still occupied by Minot. The Aviator departed Staples and parked at Walgreens, Daniel Webster Highway, Nashua, N.H. Patton exited the vehicle and entered Walgreens again followed by a member of the surveillance team. While inside the store, Patton purchased two Verizon pre-paid Samsung disposable cell phones. After completing the purchase, Patton left the store and returned to the Aviator, where Minot was waiting.

At approximately 4:39 p.m., the surveillance team watched the Aviator move from Walgreens to the parking lot at a Wendy's restaurant next door to Walgreens. Patton and Minot remained inside the vehicle in the Wendy's parking lot for a short period before Patton got out of the Aviator. As she exited the Aviator, Patton was speaking on the telephone. She remained on the telephone for a few minutes and then entered Wendy's with Minot.

Citibank records show that at 4:47 p.m. on April 16, 2014, a call was placed to its credit call center from someone identifying themselves as **Ann R.** Hunter. The caller stated that she had opened her Best Buy card on Saturday, April 12 and had used it then but complained that it was denied when she tried to use it again on April 16. When the call center's customer service representative tried to verify the account, the caller was not able to supply the correct date of birth, Social Security number or zip code. As the customer service representative was trying to surreptitiously transfer the call to Citibank's fraud center, the caller hung up.

According to Citibank records, at 4:55 p.m., Citibank's credit call center received another phone call requesting that the phone number on the newly opened "Amy Hunter" account be changed from the previously assigned "978" number to (508) 683-9233. The caller "verified" her identity by providing the correct Social Security number and zip code associated with the account. According to a recording of this call obtained from Citibank, "Amy Hunter" complained that she had just been declined when trying to use the credit account at the Best Buy at the Pheasant Lane Mall. The customer service representative blamed it on a "bump" in the transmission process and assured her that it should not happen again.

Minot's black Lincoln Aviator eventually left Wendy's and, at approximately 5:50 p.m., the surveillance team followed it once again to the Pheasant Lane Mall, where once more it parked in front of the Dick's Sporting Goods store. Soon thereafter, Minot exited the vehicle, entered the mall through Dick's and, followed by a member of the surveillance

6

team, proceeded to the Best Buy Mobile store.   At 5:54 p.m., about four minutes after Minot headed toward the Best Buy Mobile store, the Citibank call center received yet another call from an individual claiming to be **Ann R.** Hunter.   The caller stated that she recently had used her account to pay for a $2000 purchase.   She further explained that, at the time of that purchase, she was told that she would need to wait until she could use it again and that she was calling to make sure she in fact could use it.   The customer service representative informed the caller that she had a credit limit of $6000 and had only used $2000 and that therefore she had available credit of about $4000.

While inside the Best Buy Mobile store, Minot spoke to a clerk for a short period, before leaving the store empty-handed.   According to the store manager, during this visit to the store, Minot had once more attempted to purchase $2000 in Best Buy gift cards using the "Amy Hunter" account, but, despite the assurances she had received from the customer service representative, was denied for a second time.   Minot returned to, and entered, the Aviator, which was still occupied by Patton.

The surveillance team then watched the black Lincoln Aviator leave the Pheasant Lane Mall and followed it north, until, at approximately 6:34 p.m., it arrived at the Mall of New Hampshire, 1500 S. Willow St., Manchester, N.H.   At 6:04 p.m., while the Aviator was en route to Manchester, Citibank's call center received another call, this one about the newly opened "Amy Hunter" account.   The call once more came from the newly assigned "508" telephone number.   This time the caller "verified" her identity by providing not only Amy Hunter's name and correct Social Security and zip code numbers, but also her correct date of birth.   According to a recording of this call provided by Citibank, the caller complained about her account not being "located" when presented for use.   The customer service representative told her that there was probably an error in entering the account number and suggested that the sales clerk enter it more slowly.

Upon the Aviator's arrival at the Mall of New Hampshire, Minot got out of the vehicle, entered Best Buy and approached a cashier.   She left the store a short time later. According to the manager of the Best Buy store, Minot purchased six gift cards, totaling approximately $2,400, successfully paying for them using a credit card account previously established in the name of **Ann R. Hunter.**"

The surveillance team observed Minot leave the mall and, re-enter the black Lincoln Aviator, which then headed south.   At approximately 7:41 p.m., the Aviator parked in a lot in front of Starbucks, 101 Commerce Way, Woburn, Massachusetts.   Minot exited the vehicle and entered a nearby Target store followed by surveillance team members. Minot approached the customer service desk and exited the store a short time later.   The manager of Target stated that, while in the store, Minot attempted to open a new credit card account, but, when asked for a driver's license, immediately left the store without doing so.   Minot returned to the Aviator, which was still parked in front of Starbucks and still occupied by Patton.

The black Lincoln Aviator departed Starbucks and, at approximately 8:30 p.m., arrived at Best Buy, 162 Santilli Highway, Everett, Massachusetts.   There, Minot got out of the vehicle and entered the store while Patton again remained in the vehicle.   A short time later, Minot exited the store and got back into the Aviator with Patton.   According to the manager of the Everett Best Buy, while inside the store, Minot purchased five gift cards, with a total value of approximately $1400, using the previously established "**Ann R.** Hunter" credit card account.

After Minot finished at the Everett, Massachusetts Best Buy and got back into the black Lincoln Navigator with Patton, the surveillance team followed the Aviator south toward Boston.   At approximately 9:10 p.m., after the vehicle crossed the city limits, the team executed an investigatory traffic stop.   At the time of the stop, Minot was driving and Patton was in the passenger seat.   During the stop, BPD Detective Tim Laham, saw that Patton was clutching an item in her left hand.   He retrieved the item and saw that the item was a sales receipt from one of Minot's Best Buy gift card purchases earlier in the day. Patton complained about the stop and subsequent police action, spontaneously stating that she *"only had a few cards."*   Later, after declining to submit to an interview, Minot remarked, *"You caught us red-handed.   What else is there to talk about?"*

   b.   The Searches

The surveillance team searched the black Lincoln Aviator, Patton and Minot incident to Patton's and Minot's arrests.   Those searches yielded, most importantly, eleven Best Buy gift cards, still in their packaging, from a purse that also contained personal effects belonging to Patton.   The purse was found on the passenger side – Patton's side – of the Aviator.   Some of the eleven gift cards had visible information on them indicating that at least those particular gift cards had been purchased in Manchester, N.H., and Everett, Massachusetts.   The total number of gift cards Minot purchased that day in Manchester and Everett was eleven, the same number of gift cards found in Patton's purse.

Other items recovered during the searches incident to arrest included the following:

- from a purse under the driver's seat, a Massachusetts identification document bearing a photograph of an individual who appears to be Minot but bearing the personal identifying information of **Ann R.** Hunter of Medfield, Massachusetts, and a note bearing Social Security and telephone numbers determined to belong to **Ann R.** Hunter;

- receipts and other paperwork relating to the transactions at Best Buy earlier that day; and

- from the passenger side glove compartment, a black wig.

With respect to the wig, Minot's actual hair was colored blond but she wore the black wig for some but not all of the transactions that took place on April 16, 2014.   For example,

8

Minot's hair appeared to be black during her first visit of the day to Best Buy but blond when she entered the Pheasant Lane Mall through Dick's later in the day. Members of the surveillance team never saw Minot change her wig in public (creating the reasonable inference that she did so in the vehicle, in Patton's presence and with Patton's knowledge).

The searches incident to arrest also yielded two "like-new" Verizon pre-paid Samsung disposable wireless phones like those Patton purchased at Walgreens. Along with those phones were empty boxes and other original packaging labeled with "serial numbers," corresponding to the two phones. The phones were found in the inner console of the Aviator with a small piece of paper bearing in handwriting the telephone number (508) 683-9233 – the "508" number to which, according to Citibank investigator, the "Amy Hunter" account was eventually assigned. According to a forensic examination, the telephone number assigned to one of the two like new phones was the same "508" number. The forensic examination of the phone's call log further revealed that the phone was used to contact (800) 365-0292 – Citibank's Best Buy credit card call center at approximately 6:04 p.m. – the same time Citibank's records show receipt of a call from that number about the "Amy Hunter" account. A forensic examination of the second disposable cell reflects that it was used to make the two calls to Citibank regarding the **Ann R.** Hunter account described above.

A third cell phone, one that was clearly not new, was recovered from the Aviator's dashboard on the driver's side – the side of the vehicle on which Minot was sitting at the time of the traffic stop. Records from the cell phone provider for that phone establish that the phone belongs to Minot. According to a forensic examination of that phone, between the time Patton first entered Minot's black Lincoln Aviator and the time of the arrests less than eight hours later, there were seventeen telephone calls messages between that phone and a telephone number the "Contacts" directory associated with "Trida." Trida is Patton's nickname. All but one of the seventeen calls between the two telephones lasted less than a minute.

    c.  Jurisdictional Facts

When a customer applies for a credit account at a Best Buy store, it is done through an electronic transmission from the store to Citibank. The credit decision is made by Citibank on a system located on servers in Dallas, Texas, and Columbus, Ohio. Citibank then transmits the credit decision through a vendor called Integrated Partner Solution with a mainframe in the bank's Southwest and Midwest data centers. Accordingly, all applications and approvals on applications from Best Buy stores in New Hampshire involve multiple interstate wire transmissions.

When a customer makes a transaction with a Best Buy account, the transaction information is processed electronically from the store to Citibank's vendor, First Data Resources, with servers located in Chandler, Arizona, and Omaha, Nebraska. Also, Citibank's call center for Best Buy accounts is located in Sioux Falls, South Dakota.

Therefore, all purchases made from New Hampshire with Best Buy credit card accounts and all calls to the Best Buy credit card service center from New Hampshire necessarily both involve interstate wire transmissions.

4.   **Penalties, Special Assessment and Restitution.**

The defendant understands that the penalties for the offense are:

A.   With respect to Count One, a maximum prison term of 5 years (18 U.S.C. § 371), and with respect to each of Counts Thirteen and Fourteen, a mandatory minimum sentence of two years that must run consecutively to the sentence on Count One and which can be imposed to run consecutively to each other.

B.   For each count, a maximum fine of $250,000 or not more than twice the gross gain to the defendant (18 U.S.C. §3571).

C.   For each count, a term of supervised release of not more than 3 years.   The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release. (18 U.S.C. §§ 3559 and 3583).

The defendant also understands that she will be required to pay a special assessment of $300, $100 for each count of conviction, at or before the time of sentencing; and that the Court may order her to pay restitution to the victim(s) of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5.   **Sentencing and Application of the Sentencing Guidelines.**

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines.   The defendant further understands that she has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or his sentence is other than she anticipated except as provided herein.

10

The defendant also understands that the United States and the United States Probation Office shall:

A.     Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B.     Respond to questions from the Court;

C.     Correct any inaccuracies in the pre-sentence report;

D.     Respond to any statements made by her or her counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that she may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6.     **Sentencing Stipulations and Agreements**.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the government and the defendant stipulate as follows:   (a) the appropriate sentence on Count One is six months; (b) the mandatory minimum twenty-four month sentences on Counts 13 and 14 should run consecutive to each other and to the sentence on Count One; and (c) the total appropriate sentence is therefore 54 months.

The parties intend the above stipulations to be "binding" under Fed. R. Crim. P. 11(c)(1)(A) and/or (C). By using the word binding the parties mean that if the Court will not accept the plea agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw her guilty plea.

The United States and the defendant are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. **Acceptance of Responsibility**.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A.   Fails to admit a complete factual basis for the plea at the time she is sentenced or at any other time;

B.   Challenges the United States' offer of proof at any time after the plea is entered;

C.   Denies involvement in the offense;

D.   Gives conflicting statements about that involvement or is untruthful

with the Court, the United States or the Probation Office;

E.     Fails to give complete and accurate information about her financial status to the Probation Office;

F.     Obstructs or attempts to obstruct justice, prior to sentencing;

G.     Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.     Fails to appear in court as required;

I.     After signing this Plea Agreement, engages in additional criminal conduct; or

J.     Attempts to withdraw her guilty plea.

The defendant understands and agrees that she may not withdraw her guilty plea if, for any of the reasons listed above, the United States does not recommend that she receive a reduction in her sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that she has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and she has assisted the United States in the investigation or prosecution of her own misconduct by timely notifying the United States of her intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level

pursuant to U.S.S.G. § 3E1.1(b).

8.   **Waiver of Trial Rights and Consequences of Plea**.

The defendant understands that she has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent her. The defendant also understands that she has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate her; and

E.   To compulsory process for the attendance of witnesses to testify in her defense.

The defendant understands and agrees that, by pleading guilty, she waives and gives up the foregoing rights and that upon the Court's acceptance of her guilty plea, she will not be entitled to a trial.

The defendant understands that if she pleads guilty, the Court may ask her questions about the offense, and if she answers those questions falsely under oath, on the record, and in the presence of counsel, her answers will be used against her in a prosecution for perjury or making false statements.

9.  **Acknowledgment of Guilt; Voluntariness of Plea**.

The defendant understands and acknowledges that she:

A.  Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because she is guilty;

B.  Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C.  Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.  Understands the nature of the offense to which she is pleading guilty, including the penalties provided by law; and

E.  Is completely satisfied with the representation and advice received from her undersigned attorney.

10.  **Scope of Agreement**.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority.   The defendant also acknowledges that no representations have been made to her about any civil or administrative consequences that may result from her guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved.   The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11. **Collateral Consequences**.

The defendant understands that, as a consequence of her guilty plea, she will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. **Satisfaction of Federal Criminal Liability; Breach**.

The defendant's guilty plea, if accepted by the Court, will satisfy her federal criminal liability in the District of New Hampshire and the District of Massachusetts arising from her participation in the conduct that forms the basis of the Superseding Indictment in this case.   The defendant understands that if, before sentencing, she violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

16

13. **Waivers.**

    A.    **Appeal.**

The defendant understands that she has the right to challenge her guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives her right to challenge on direct appeal:

    1.    Her guilty plea and any other aspect of her conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

    2.    The sentence imposed by the Court if within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of her rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

    B.   **Collateral Review**

The defendant understands that she may have the right to challenge her guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives her right to collaterally challenge:

    1.    Her guilty plea, except as provided below, and any other aspect of her conviction, including, but not limited to, adverse rulings on pretrial suppression

17

            motion(s) or any other adverse disposition of pretrial
motions or issues; and

2.      The sentence imposed by the Court if it falls within, or
lower than, the guideline range as determined by the
Court, or if it is imposed pursuant to a minimum
mandatory sentence.

The defendant's waiver of her right to collateral review does not operate to waive a collateral challenge to her guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of her right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

### C. **Freedom of Information and Privacy Acts**

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

### D. **Appeal by the Government**

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal s authorized by law.

18

14.     **<u>No Other Promises</u>**.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15.     **<u>Final Binding Agreement</u>**.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16.   **Agreement Provisions Not Severable.**

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN P. KACAVAS
United States Attorney

Date: 11-20-14          By:   William E. Morse

William E. Morse
Assistant U.S. Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
(603) 225-1552

The defendant, Lois Patricia Patton, certifies that she has read this 20-page Plea Agreement and that she fully understands and accepts its terms.

Date: 11-18-14

Lois Patricia Patton, Defendant

I have read and explained this 20-page Plea Agreement to the defendant, and she has advised me that she understands and accepts its terms.

Date: 11/18/14

Jonathan R. Saxe, Esquire
Attorney for Lois Patricia Patton

20

RECEIVED
U.S. ATTORNEY'S OFFICE
NEW HAMPSHIRE
2014 NOV 20  AM 8 12